189 So.2d 354

John L. ADAMS

v.

STATE.

3 Div. 172.

Court of Appeals of Alabama.

June 30, 1966.

Rehearing Denied Sept. 20, 1966.

L. H. Walden, Montgomery, for appellant.

Richmond M. Flowers, Atty. Gen., and John C. Tyson, III, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted without oral argument on April 22, 1965.

Adams stands convicted on six counts of embezzling, in all some $16,600, from Mrs. Flora R. Thorpe. After pronouncement of verdict, allocutus and adjudication of guilty, the trial judge sentenced Adams to ten years imprisonment. Code 1940, T. 14, § 126, as amended, and § 133.

That Adams and Mrs. Thorpe were partners and hence embezzlement could not legally occur in such a relationship is the sole point which Adams advances in brief. Anno. 17 A.L.R. 982.

## I.

Adams chose not to take the stand. All the evidence was adduced through prosecution's witnesses.

The indictment came on for trial May 13, 1964, at which time Mrs. Thorpe was 88 years old.

She testified that, from October 7, 1960, through November 11, 1961, she cashed some twenty-five checks payable, or endorsed over, to her. The proceeds, $52,-830, she turned over to Adams.

Her description of the purpose of these transfers was vague:

"Q Mrs. Thorpe, you stated that you delivered the money in its entirety from each of those checks to Mr. Adams. Did you have any agreement or understanding with Mr. Adams made here as to what he was to do with those monies?

"A He just borrowed it as a loan when I first began trading with him.

"Q Now, then as you got on down there, did you have any understanding as to what he was to do with the money?

"A Not a specific thing.

"Q Did you give him the money for his own money? To put in his pocket, burn up, throw away, or anything he wanted to do with it?

"A I didn't give it to him to throw away, but I gave it to him to use at his discretion.

"Q At his discretion? Well, was there an understanding or not that the money was to be returned to you?

"A Oh, yes, sir. He knew it was going to be returned.

"Q You gave it into his custody to be used and then returned to you?

"A Yes, sir.

"Q Was it to make money for you?

"A I beg your pardon.

"Q Was the money to be used to make money for you? Were you going to realize any money from it? Did he say he would make some money for you?

"A Why, he expected to make some money out of it.

"Q That is what I am getting at. Now, what did he tell you he was going to do with it, Mrs. Thorpe? See what I am getting at?

"A Well, when he first began getting it, it was helping him in some trucking concern.

"Q Was that the Yellow Transit Company?

"A No, sir. It was way back. There were several of those—

"MR. WALDEN: Your Honor, we object to going way back—

"MR. HARTLEY: I'm not asking for that, Your Honor.

"Q Now, Mrs. Thorpe, after these checks began in 1961 in June, was that the Yellow Transit Company at that time?

"A I couldn't answer that correctly.

    *    *    *    *    *    *

"Q Do you understand, Mrs. Thorpe, what I am asking for? Did you tell Mr. Adams what he was to do with your money?

"A I didn't tell him—

"Q Did he tell you what he was going to do with your money?

"A He was going to invest it in whatever business he could look to at that time.

"Q And was he then to return it to you?

"A Why, of course, he was to return it to me.

"Q All right, now, that began in 1961, did it, Mrs. Thorpe? Have you ever received to this good moment any money whatever in return from John L. Adams?

"A Yes, I have received some.

"Q How much have you received back?

"A I couldn't tell you that.

"Q Have you received as much as $100.00?

"A Oh, yes. One time I received $200.00.

"Q One time you got $200.00. And has he—have you ever gotten a total of $1,000.00 back from him, do you suppose?

"A I could almost say that I have.

"Q Almost gotten back $1,000.00? Now, did Mr. Adams ever talk to you about a Mr. Beaman?

"A Mr. who?

"Q Mr. Beaman.

"A Yes, sir."

In contrast, on cross-examination, Mrs. Thorpe testified:

"Q Mrs. Thorpe, was there a partnership arrangement with you and Mr. Adams?

"A I didn't understand you.

"Q Did you have partnership arrangements with Mr. Adams?

"A I did not draw up any papers, but there was an agreement that he would have a partnership.

"Q There was an agreement that he was to be your partner? Is it true that you didn't want your name—

"A I wanted a silent partner, I don't know what that means but I didn't want to have anything of business to do with it, I didn't want to be bothered with the details of it, I wanted to have confidence in the man that I was dealing with that I didn't have to watch every dot of the I and a crossing of the T's.

"Q Is it true that you wanted John L. Adams to use other names than your name in this business?

"MR. HARTLEY: Now, we object if the Court please. The agreement about the partnership we have no objection, 'other names', we object to.

"Q Did you want your name used in the partnership?

"A I don't know what you mean by silent partnership, but I just did not want to be known in the partnership.

"Q You did not want to be known in the partnership?

"A No.

"Q Is it true that under this agreement you would furnish capital, meaning money and finances and that you expected 50 percent of the net profit?

\* \* \* \* \* \*

"A It was never a case of expectation, he felt so grateful that I was helping them in this situation, he said, 'Well, I'll just give you half of it.' He said, 'To be perfectly frank with you I feel like you ought to have all of it.' And he furnished a great deal of the capital himself.

"Q He furnished capital, and did he also furnish his services as manager and operator of that business?

"A Yes, sir."

Mrs. Thorpe and Adams went to meet Mr. Beaman. She had received a telegram which read:

" 'Collect, Atlanta, Ga. 7:12 P. M. EST —Mrs. E. W. Thorpe, 214 North Pine

St. Greenville, Ala: The lease agreement and transportation authority is set for final payment will release immediately here in Atlanta in person to you $821,-496.84 due you. Tax and other business expense accumulated against you due revenue Department here in Atlanta of $56,960.63 Sorry we cannot deduct from one account to pay another. Let me know when you will be in Atlanta for exchange. Glen R. Beaman, U. S. Government Southeastern Transportation Division.' "

She gave the original of the telegram to Adams.

An accountant and an attorney went to Atlanta with Mrs. Thorpe in response to the telegram. No one ever saw Beaman.

## II.

Part of the circuit court's oral charge to the jury reads:

"Now, one can not embezzle or steal partnership funds, but, if, in this case, Mrs. Thorpe gave the money to the defendant Adams, for partnership purposes and instead of using the funds for partnership purposes Adams fraudulently converted the same to his own use, that would be embezzlement. And if you are convinced beyond a reasonable doubt and to a moral certainty that that's true it would be your duty to convict the defendant of embezzlement."

The exception which Adams claims "protected the record" for him on this point appears thus:

"And I further except to this further charge 'in this case Mrs. Thorpe gave the money to the defendant, Adams, for partnership purposes and instead of using the funds for partnership purposes Adams fraudulently converted the same to his own use, that would be embezzlement.'

"THE COURT: I don't think I said that she gave it to him, I said 'if' she gave it to him, didn't I?

"MR. WALDEN: Yes, sir.

"THE COURT: Be sure and get that word 'if' in."

This court, in Wall v. State, 2 Ala.App. 157, 56 So. 57, said:

"While it is true that, if one receives money with the fraudulent intent at the time of converting it to his own use, he may be, and probably is, guilty of a larceny, it is also the law that, if before or at the time of receiving the money the intent had been secretly formed to convert it by the party receiving it, he may nevertheless be guilty of embezzlement, if he afterwards unlawfully converts it to his own use. Having received the money as a duly authorized agent, the act of receiving is a lawful one, and his uncommunicated intentions, formed before or at the time, to convert it would not entitle defendant in this case to an acquittal of the charge of embezzlement, if he lawfully received the money as an agent, and then unlawfully converted it. If the defendant, while in the lawful possession of the money as agent, the care and custody of it being intrusted to him, fraudulently converts such money to his own use, he would be guilty of embezzlement within the meaning of the statute, notwithstanding the fact that he may have had a secret or uncommunicated intention of converting the money before he received it. * * *"

In Indemnity Ins. Co. of North America v. Holiway, 233 Ala. 100, 170 So. 329, Foster, J., says:

"A loan made by a trustee to himself is a conversion. It is embezzlement if, when made, the trustee had no reasonable expectation of being able to pay it or without adequate security, or if a repayment was dependent upon some uncertain contingency.

"*   *   *   *   *   *

" * * * So that we have here evidence of a loan by McGarry, trustee to him-

self, of the trust funds, upon inadequate or no security. What he did with the money does not appear. The circumstances called for an explanation by him or on his behalf. He did an act which he knew to be illegal, and was a conversion in law and fact. He is presumed to intend to convert it unless the contrary is shown. The contrary is not attempted to be shown. The situation therefore justifies a finding that such intent existed. * * *"

▆▆▆ Demand for return is no condition precedent to showing embezzlement a statutory crime which "involves two general ingredients or elements: First, a breach of duty or trust in respect of money, property, or effects in the party's possession belonging to another; secondly the wrongful or fraudulent appropriation thereof to his own use. There must be the actual and lawful possession or custody of the property of another by virtue of some trust, duty, agency, or employment on the part of the accused, and, while so lawfully in the possession of such property, it must be unlawfully and fraudulently converted to the use of the person so in the possession and custody thereof. * * *" Reeves v. State, 95 Ala. 31, 11 So. 158.

However, it is needful to explain the difference between this case and that in Henderson v. State, 129 Ala. 104, 29 So. 799:

"The defendant was given money by the prosecutor in Pike county for the purpose of buying a ticket in Bullock county for a workman he was to bring from there back to Pike county on the following Thursday. He neither brought the workman nor returned the money. Whether he went to Bullock county immediately does not appear; but it [was] shown that he was in that county later than the Thursday mentioned, and in the same month, and that he remained there until his arrest. There is an absence of evidence to show that any conversion or appropriation of the money occurred in Pike county. A mere failure to return money intrusted to an agent, without evidence of a fraudulent appropriation or disposition, is not sufficient to constitute the crime. * * *"

See also Boyd v. State, 41 Ala.App. 507, 138 So.2d 60, where the defendant took the stand and testified that his business failed in 1959. Without more to countervail this, the State there failed to show fraudulent intent to deprive the owner.

Here, in addition to the telegram, there was evidence of Adam's making tax assessments of nonexistent trucks and various documents of condonation, exculpation and ratification which Mrs. Thorpe signed or copied in extenso ad libitum. Also, Mrs. Thorpe's capacity to form intent to do business—in view of her obvious brief attention span and age—may well have impressed the jury that Adams was pulling the wool over her eyes.

## III.

▆▆▆ The nature of a partnership at common law is a relationship between two or more persons for profit (or loss) in stipulated shares characterized by (1) a lack of legal personality as distinguished from that of the partners; (2) mutual agency and suretyship.

Hence, a civil law case such as State v Peterson, 232 La. 931, 95 So.2d 608, where there is a separate *persona dicta* (see particularly the dissenting opinions) would afford but slight persuasive reasoning for us.

In Ward v. State, 113 Miss. 22, 73 So. 865, we find:

"* * * The case was affirmed on the theory that the defendant's evidence failed to show a partnership, there being no dispute but what the state's evidence negatives a partnership. * * *

* * * * * *

"* * * We do not think that there was any partnership, even on the de-

fendant's evidence, and that a partnership is not to be presumed from the mere division of profits. There should be some joint liability and some joint ownership of the partnership property, if there was a partnership, in each partner, and the proof in this case is insufficient to show a partnership, and the partnership is not presumed in dealings in real estate. \* \* \*

 Here, we think the State made a prima facie case of embezzlement. Whether there was or was not a partnership was a question, part law and part fact.

 As between the parties, their intention in going into a business relationship is the single most critical criterion. This rule is to be distinguished when the controversy involves third parties. Tayloe v. Bush, 75 Ala. 432, says in the latter case "a partnership may arise by mere operation of law."

"\* \* \* An actual partnership relation does not arise by operation of law in any case; persons do not become partners except by agreement, expressed or implied, \* \* \* A partnership liability may be imposed upon a person under principles of estoppel, where he holds himself out, or permits himself to be held out, as a partner in an enterprise. In such cases there is no actual or legal partnership relation but merely a partnership liability imposed by law in favor of third persons." 40 Am.Jur., Partnership, § 17.

In Zuber v. Roberts, 147 Ala. 512, 40 So. 319, the court had a bill for dissolution and for accounting between claimed partners. In the course of affirming the lower court which had found no partnership, the court said:

"While the evidence shows a community of interest in the profits, it does not satisfactorily show that under the arrangement and conduct of the business there was to be any community in the losses. \* \* \*"

Adam's claim of partnership was one between himself and Mrs. Thorpe. Certainly, no judge would rely on her ambivalent —or trivalent—testimony to declare the existence of a partnership with Adams as an "operation of law."

The law afforded him the right to bring in evidence to show a community of interest in profits and losses. The courts will not supply what essentially is a conclusion to be drawn from the surrounding facts.

If the defendant wanted the jury to consider the legal implications of the facts further, he could have requested further instructions in writing. Code 1940, T. 7, § 273.

The judgment below is due to be

Affirmed.